TOLAN AND SON, INC., Plaintiff-Appellant, v. KLLM ARCHITECTS, INC., *et al.*, Defendants-Appellees (Total Concept Land Design, Inc., *et al.*, Defendants).

First District (1st Division) No. 1—98—2581

Opinion filed September 30, 1999.

Steven L. Baron and Scott E. Becker, both of D'Ancona & Pflaum, of Chicago, for appellant.

Clausen Miller, P.C., of Chicago (Edward M. Kay, Douglas J. Palandech, Michael H. McColl, and Imelda Terrazino, of counsel), for appellee KLLM Architects, Inc.

Lorence H. Slutzky and Kenneth M. Florey, both of Robbins, Schwartz, Nicholas, Lifton & Taylor, Ltd., of Chicago, for appellee Louis K. Walter, Jr.

Stephen D. Sharp, of Kovitz Shifrin & Waitzman, of Buffalo Grove, for appellee Lawrence W. Reiss.

JUSTICE RAKOWSKI delivered the opinion of the court:

In *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69 (1982), the Illinois Supreme Court held that a plaintiff cannot recover in tort for solely economic loss, loss that is not accompanied by either personal injury or property damage. This rule is known as the economic loss doctrine. The supreme court then discussed two exceptions

to the rule: where defendant commits fraud or intentional misrepresentation and where defendant, who is in the business of supplying information for the guidance of others, makes a negligent misrepresentation. In *2314 Lincoln Park West Condominium Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.*, 136 Ill. 2d 302 (1990), and *Fireman's Fund Insurance Co. v. SEC Donohue, Inc.*, 176 Ill. 2d 160 (1997), the supreme court held that because the focus of an engineer's or architect's work is usually tangible—a building, a structure, or a product—it is not in the business of providing information. The court held that any information provided is merely incidental to the finished product. Thus, the negligent misrepresentation exception to the economic loss doctrine does not generally apply to engineers and architects. In this opinion, we consider whether the rule concerning architects and engineers is absolute or whether there are situations, such as when an architect or engineer is hired solely to provide information rather than construct a building or structure, where the negligent misrepresentation exception may apply. Because we conclude that neither *2314 Lincoln Park West* nor *Fireman's Fund Insurance* sets forth an absolute bar, there may well be situations where a plaintiff may maintain a cause of action against an architect or engineer based on the negligent misrepresentation exception to the *Moorman* doctrine. However, based on the facts present in the instant case, we find that the exception is not applicable to KLLM Architects, Inc., and Louis K. Walter, Jr., because they were not retained to provide information but, rather were retained to build a structure. With regard to defendant Lawrence Reiss, we remand to the circuit court to further determine his role in the construction project.

## BACKGROUND

Plaintiff, Tolan & Son, Inc. (Tolan), is a residential contractor which developed and constructed a 13-building townhome complex called Meadow Mews in Tinley Park, Illinois. In October of 1989, Tolan entered into an oral agreement with KLLM Architects, Inc. (KLLM), for the preparation of plans and designs for the complex. KLLM is an architectural firm in the business of providing plans and specifications for residential and commercial developments. At the same time, Tolan entered into an oral agreement with Total Concept Land Design (Total Concept). Total Concept was responsible for land-planning services and preparing proposed layout designs, site plans, and landscaping plans. These designs were purportedly submitted to Intercon Engineering Corporation (Intercon), a civil engineer, which had provided Tolan with engineering drawings of the property. Intercon was responsible for setting the final grades for the site to accommodate KLLM's architectural designs.

In April of 1990, Tolan entered into an oral agreement with Terra Testing, Inc. (Terra), for soil engineering services, including an analysis of soil conditions for the purpose of confirming Total Concept's proposed placement of each building. In May, a Terra representative indicated that the proposed sites for several of the buildings were over peat, which was highly compressible and not suitable for supporting the buildings' foundations. Despite this information, the site plans were not revised and construction began. During July Tolan asked KLLM to recommend a geotechnical engineer to review excavation at one site. KLLM recommended Louis K. Walter, Jr. (Walter), whose business involved soil engineering and subsurface investigation services.

In the spring of 1991, Tolan, KLLM, and Total Concept discussed the idea of relocating buildings 10, 11, and 12 farther south. KLLM and Total Concept were aware that the new locations were over peat but redesigned the site plans notwithstanding. Neither KLLM nor Total Concept advised Tolan that relocation would create problems. Around the same time, Intercon had numerous contacts with KLLM and Total Concept concerning the movement of the buildings, indicating that relocation was not advisable because of the peat below. Apparently these concerns went unheeded and the plans were not revised to accommodate or eliminate them.

In July of 1991, Walter examined the soil and fill at building 9. He made certain recommendations pertaining to the fill and grade to be used in setting the foundations and the necessary support system. It was at this time that Walter first mentioned the use of caissons. KLLM revised the plans according to Walter's recommendations but did not incorporate the caissons. Walter examined the soil beneath buildings 10, 11, and 12 in March of 1992, making the same recommendations he made with respect to building 9.

During construction in the spring of 1992, Tolan discovered cracks in some of the foundations and contacted KLLM. In May, an employee from KLLM visited building 10. Following this visit, KLLM forwarded a letter to Tolan stating that a structural engineer on its behalf, Lawrence Reiss (Reiss), recommended additional reinforcement bars in the foundation walls of buildings 11 and 12. In June KLLM, Reiss, and Walter inspected building 11 to observe cracks in its foundation. At this time, according to Tolan's complaint, all three defendants stated the cracks were due to concrete being poured too wet and high stress areas in the intersections of the foundation walls. According to them, the cracks did not affect the structural integrity of the building. In July, Walter conducted soil boring tests at the proposed site of building 12 for the purpose of making recommendations regarding the

design and construction of its foundation. Although Walter recommended the use of caissons, he did state that, alternatively, building 12 could be completed in the same manner as buildings 9, 10, and 11. The foundation in building 12 was not altered and caissons were not added. In December, Walter inspected cracks in building 12. He stated that some of the cracks were due to high stress areas and were typical. Other cracks were due to normal shrinkage. He stated these cracks did not impair the structural integrity. In March of 1993, Walter again inspected building 11. He stated that the cracks were due to insufficient frost protection.

According to Tolan, at no time did KLLM, Walter, or Reiss advise it that any of the cracks were the result of instability in the soil structure, although each of them knew of the peat underneath.

In April of 1993, Tolan contacted Dave Pate & Sons Construction, a concrete repair company, to evaluate the cracks. According to Pate, the cracks were the result of the inadequate bearing capacity of the soil below the foundations. Frank A. Guisinder, Jr., a structural engineer, confirmed this causation opinion, opining that the cracks were due to the instability of the supporting soil stratum. Thereafter, Tolan remediated the property at a cost in excess of $725,000.

Tolan then filed the instant suit. Counts I though IV are breach of contract claims against KLLM, Total Concept, Walter, and Terra Testing, respectively. These counts are not before this court. Counts V through VIII are negligent misrepresentation claims against Reiss, KLLM, KLLM as principal of Reiss, and Walter, alleging negligent misrepresentations in the evaluation and supplying of information regarding the foundational cracks. In these counts, Tolan seeks solely economic loss damages for remediation of the foundations. Defendants filed motions to dismiss pursuant to section 2—619 of the Code of Civil Procedure (735 ILCS 5/2—619 (West 1996)), which the trial court granted. We have jurisdictions pursuant to Supreme Court Rule 304(a) (155 Ill. 2d R. 304(a)).

## ISSUE

The sole question on appeal is whether the trial court erred in granting each of the defendants' motions to dismiss. The trial court granted the motions on the basis that Tolan seeks purely economic losses and, thus, the *Moorman* doctrine (*Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69 (1982)), bars its claims against each defendant. Further, it concluded that the negligent misrepresentation exception to the *Moorman* doctrine did not apply because defendants are architects and engineers and are not in the business of supplying information for the guidance of others.

## STANDARD OF REVIEW

■ "The purpose of a motion to dismiss under section 2—619 *** is to afford litigants a means to dispose of issues of law and easily proved issues of fact at the outset of a case, reserving disputed questions of fact for a jury trial." *Zedella v. Gibson*, 165 Ill. 2d 181, 185 (1995). All well-pleaded facts in the complaint are admitted, but conclusions of law and fact unsupported by specific allegations are not. *Draper v. Frontier Insurance Co.*, 265 Ill. App. 3d 739, 742 (1994). The trial court must construe the motion and supporting documents in the light most favorable to the nonmovant. *Draper*, 265 Ill. App. 3d at 742. "Section 2—619(a)(9) allows dismissal when 'the claim asserted *** is barred by other affirmative matter avoiding the legal effect of or defeating the claim.' " *Zedella*, 165 Ill. 2d at 185, quoting Ill. Rev. Stat. 1991, ch. 110, par. 2—619(a)(9). "The question on appeal is 'whether the existence of a genuine issue of material fact should have precluded the dismissal or, absent such an issue of fact, whether dismissal is proper as a matter of law.' " *Zedella*, 165 Ill. 2d at 185-86, quoting *Kedzie & 103rd Currency Exchange, Inc. v. Hodge*, 156 Ill. 2d 112, 116-17 (1993). In reviewing a section 2—619 dismissal on the ground that the underlying claim is barred by some affirmative matter, we are limited to considering the legal questions presented by the pleadings. *Waterford Executive Group, Ltd. v. Clark/Bardes, Inc.*, 261 Ill. App. 3d 338, 343 (1994). We review the trial court's decision *de novo*. *Kedzie*, 156 Ill. 2d at 116.

## DISCUSSION

### A. *Moorman* Doctrine—
### Application to Architects and Engineers

■ In *Moorman Manufacturing Co. v. National Tank Co.*, 91 Ill. 2d 69 (1982), the Illinois Supreme Court adopted the economic loss doctrine. "In a nutshell, [the economic loss] doctrine bars a plaintiff from recovering in negligence for losses which are purely economic, that is, do not involve personal injury or property damage. The court reasoned that tort law is not intended to compensate parties for monetary losses suffered as a result of duties which are owed to them simply as a result of a contract." *Nepomoceno v. Knights of Columbus*, No. 96 C 4789, slip op. at ___ (N.D. Ill. February 8, 1999). However, negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in business transactions is an exception to the *Moorman* doctrine. *In re Chicago Flood Ligation*, 176 Ill. 2d 179, 199 (1997). Further, businesses that provide informational services as well as a product may be considered a business that supplies information. See *Nepomoceno*, slip op. at ___.

In *2314 Lincoln Park West Condominium Ass'n v. Mann, Gin, Ebel*

& *Frazier, Ltd.*, 136 Ill. 2d 302 (1990), the Illinois Supreme Court addressed the application of the *Moorman* doctrine and its negligent misrepresentation exception to architects. The court first noted that not only the Illinois Appellate Court but also courts in other jurisdictions were split on the issue. It concluded that, pursuant to *Moorman* and its progeny, a tort action does not lie against an architect when plaintiff seeks to recover "purely economic losses due to defeated expectations of a commercial bargain." *2314 Lincoln Park West*, 136 Ill. 2d at 311. In analyzing the issue, the court focused upon duty, finding that "the concept of duty is at the heart of the distinction drawn by the economic loss rule." *2314 Lincoln Park West*, 136 Ill. 2d at 314.

> " 'The rule acts as a shorthand means of determining whether a plaintiff is suing for injuries arising from the breach of a contractual duty to produce a product that conforms in terms of quality or performance to the parties['] expectations or whether the plaintiff seeks to recover for injuries resulting from the breach of the duty arising independently of the contract to produce a nonhazardous product that does not pose an unreasonable risk of injury to person or property. The economic loss rule prevents recovery in tort when a defective product has resulted in the loss of the value or use of the thing sold, or the cost of repairing it. Under such circumstances, the duty breached is generally a contractual one and the plaintiff is merely suing for the benefit of his bargain.' " *2314 Lincoln Park West*, 136 Ill. 2d at 315-16, quoting *Flintkote Co. v. Dravo Corp.*, 678 F.2d 942, 948 (11th Cir. 1982).

While admitting that an architect may supply information that will be relied upon by others, the court stated:

> "[W]e do not believe that the character of that function should be overstated. ***
>
>> 'Obviously, a great many businesses involve an exchange of information as well as of tangible products—manufacturers provide operating or assembly instructions, and sellers provide warranty information of various kinds. But if we ask what the product is in each of the cases, it becomes clear that the product (a building, precipitator, roofing material, computer or software) is not itself information, and that the information provided is merely incidental.' (*Rankow v. First Chicago Corp.* (7th Cir. 1989), 870 F.2d 356, 364.)
>
> In the usual case, the information supplied by the architect is transformed into the building itself." *2314 Lincoln Park West*, 136 Ill. 2d at 313.

Although the court noted that the defendant 2314 Lincoln Park West dispensed information to plaintiff, the crux of plaintiff's complaint was

the way in which the condominium was designed and constructed. Thus, the information provided was incidental to a tangible object and plaintiff's claim was to be resolved under contract law. *2314 Lincoln Park West*, 136 Ill. 2d at 316-17. The architect's duty did not arise from some extracontractual duty as with an attorney whose duty "arises from a consideration of the nature of the undertaking and the lawyer's traditional responsibilities." *2314 Lincoln Park West*, 136 Ill. 2d at 318. Instead, an architect's duty generally arises by virtue of a contract specifying the duties necessary to complete the construction of a structure.

In *Fireman's Fund Insurance Co. v. SEC Donohue, Inc.*, 176 Ill. 2d 160 (1997), the court addressed the *Moorman* doctrine and the negligent misrepresentation exception relative to engineers. The certified question presented was:

> " 'Is a professional engineer who prepares plans and specifications for a construction project in the business of supplying information to others for the guidance of the recipient in its business dealings and liable in tort for negligent misrepresentation under *Moorman* ***[?]' " *Fireman's Fund Insurance*, 176 Ill. 2d at 166.

In reaching its conclusion that the negligent misrepresentation exception to the *Moorman* doctrine did not apply to an engineer, the court relied extensively upon *2314 Lincoln Park West*. It reasoned that there was no substantive difference between an architect and an engineer and, thus, the *Moorman* doctrine bars recovery in tort against either for purely economic losses. Even though defendant's plans could never have been incorporated into the structure because they were defective, the focus is on the ultimate result of the professional's work. The ultimate result of defendant's work was a water supply system—a tangible object. *Fireman's Fund Insurance*, 176 Ill. 2d at 169. Accordingly, defendant's plans and drawings were incidental to the product and, therefore, the negligent misrepresentation exception to the *Moorman* doctrine was not applicable. *Fireman's Fund Insurance*, 176 Ill. 2d at 169.

While all parties agree the supreme court's decisions in *2314 Lincoln Park West* and *Fireman's Fund Insurance* are controlling, they disagree on the scope of the holdings. Tolan argues that these cases do not set forth an absolute rule that the negligent misrepresentation exception can never apply to architects and engineers. Instead, the cases indicate that the court must evaluate the particular circumstances of each case and determine whether defendant provided information for the guidance of others or whether defendant provided information that was ancillary to a tangible end product. Originally KLLM and Reiss argued that the cases set forth an absolute rule.

However, they have abandoned that argument and instead now contend that the negligent misrepresentation exception does not apply in this case based on the facts present. In other words, they argue they were not hired to provide only information but rather were hired to build structures and provided information only ancillary thereto.

In its holding in *2314 Lincoln Park West*, the Illinois Supreme Court stated an action "will not lie in the *circumstances described.*" (Emphasis added.) *2314 Lincoln Park West*, 136 Ill. 2d at 312. Further, in addressing information provided by an architect, the court stated, "[i]n the *usual* case, the information supplied *** is transformed into the building." (Emphasis added.) *2314 Lincoln Park West*, 136 Ill. 2d at 313. Finally, the court distinguished between claims based on the quality of a building and claims based on the safety of a building. Where plaintiff's action relates to the former, there is no cause of action for negligent misrepresentation. *2314 Lincoln Park West*, 136 Ill. 2d at 316-17.

Similarly, the language in *Fireman's Fund Insurance* supports a finding that the court was not casting an absolute rule. First, the certified question incorporates the fact that the engineer was "prepar-[ing] plans and specifications for a construction project." *Fireman's Fund Insurance*, 176 Ill. 2d at 166. The court, thus, did not consider a situation where the engineer did not prepare plans and specifications but was hired solely to render an opinion.

■ Based on the foregoing, we conclude that neither *2314 Lincoln Park West* nor *Fireman's Fund Insurance* sets forth an absolute rule that architects and engineers may never be sued under the negligent misrepresentation exception to *Moorman*. Rather, the cases simply stand for the proposition that, in the usual course of events, architects and engineers provide information, plans, and specifications that are incorporated into a tangible product, building, or structure.

■ To state a claim based on the negligent misrepresentation exception to *Moorman*, plaintiff must demonstrate that: (1) defendant is in the business of supplying information for the guidance of others in their business dealings; (2) defendant provided information that constitutes a misrepresentation; and (3) defendant supplied the information for guidance in the plaintiff's business dealings. *Nicholas J. Murlas Trust v. Mobil Oil Corp.*, No. 93 C 6956, slip op. at ___ (N.D. Ill. August 18, 1995). In determining whether a particular enterprise is in the business of supplying information for the guidance of others in their business transactions, courts must undertake a "precise, case-specific inquiry." *Rankow v. First Chicago Corp.*, 870 F.2d 356, 361 (7th Cir. 1989). See also *Rosenstein v. Standard & Poor's Corp.*, 264 Ill. App. 3d 818, 823 (1993); *General Electric Capital, Corp. v. Equifax*

*Services, Inc.*, 797 F. Supp. 1432, 1442 (N.D. Ill. 1992). The determination is dependent "upon the nature of the information at issue *** and its relation to the kind of business being conducted." *Rankow*, 870 F.2d at 361. An allegation that defendant is in the business of providing information for the guidance of others is a legal conclusion that plaintiff must support with well-pleaded factual allegations. *Nicholas J. Murlas Trust*, slip op. at ___.

■ Obviously a great many businesses exchange information as well as products.

> "The Illinois Supreme Court's test for determining whether a defendant 'is in the business of supplying information for the guidance of others in their business transactions' is whether the end product of the relationship between plaintiff is a tangible object (*i.e.*, a product) which could be readily described in a contract or whether it is intangible. [Citation.] In short, if the intended end result of the plaintiff-defendant relationship is for the defendant to create a product, a tangible thing, then the defendant will not fit into the 'business of supplying information' negligent misrepresentation exception." *MW Manufacturers, Inc. v. Friedman Corp.*, No. 97 C 8319, slip op. at ___ (N.D. Ill. July 21, 1998).

Where the information supplied is merely ancillary to the sale of a product or service or in connection with the sale, defendant will not be found to be in the business of supplying information for the guidance of others in their business dealings. *Rosenstein*, 264 Ill. App. 3d at 823.

"[O]ne may envision a continuum [of enterprises] with pure information providers at one end and pure tangible good providers at the other." *Allendale Mutual Insurance Co. v. Bull Data Systems, Inc.*, No. 91 C 6103, slip op. at ___ (N.D. Ill. December 7, 1994). At the pure information end are accountants and attorneys (*Congregation of the Passion, Holy Cross Province v. Touche Ross & Co.*, 159 Ill. 2d 137 (1994)), insurance brokers (*Allendale Mutual Insurance Co.*, No. 91 C 6103), stockbrokers (*Penrod v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Ill. App. 3d 75 (1979)), real estate brokers (*Rankow*, 870 F.2d 356; *Duhl v. Nash Realty, Inc.* 102 Ill. App. 3d 483 (1981)), termite inspectors (*Perschall v. Raney*, 137 Ill. App. 3d 978 (1985)), and environmental assessors (*Tribune Co. v. Geraghty & Miller, Inc.*, No. 97 C 1889 (N.D. Ill. July 25, 1997)). At the tangible product end are manufacturers of computers and software (*Black, Jackson & Simmons Insurance Brokerage, Inc. v. International Business Machines Corp.*, 109 Ill. App. 3d 132 (1982)), manufacturers of products of any type (*Rankow*, 870 F.2d 356; *MW Manufacturers, Inc.*, No. 97 C 8319; *National Can Corp. v. Whittaker Corp.*, 505 F. Supp. 147 (N.D. Ill.

1981)), and sellers of crop sprayers (*Navistar International Corp. v. Hagie Manufacturing Co.*, 662 F. Supp. 1207 (N.D. Ill. 1987)). Between are the difficult cases, which include life insurance companies (*Nepomoceno*, No. 96 C 4789; *Gerdes v. John Hancock Mutual Life Insurance Co.*, 712 F. Supp. 692 (N.D. Ill. 1989) (found not to be information providers)), banks and financial service providers (*Rankow*, 870 F.2d 356 (found to be information providers)), and financing inspectors (*General Electric Capital, Corp.*, 797 F. Supp. 1432 (found to be information providers)). See also *Duchossois Industries v. Stelloh*, No. 87 C 4132 (N.D. Ill. January 13, 1988) (seller who prepared provenances for paintings it sold held to be provider of information).

The first category—pure information providers—includes businesses that provide a product that consists solely of information. The supplying of information need not encompass the enterprise's entire undertaking but must be central to the business transaction between the parties. *General Electrical Capital*, 797 F. Supp. at 1443. In these cases, the product is obviously information, whether about the financial market, the housing market, termite infestations, or legal or financial advice. *Rankow*, 870 F.2d at 364. This category involves those situations where the value of the services lies in the analytical work. *Tribune Co.*, slip op. at ___. In other words, the end product is the ideas, not the documents or other objects into which the ideas are incorporated. *Congregation of the Passion*, 159 Ill. 2d at 163.

The second category—tangible goods providers—includes businesses that supply tangible goods and/or noninformational goods or services. While the entity may exchange information, the information relates only to the goods or services and, thus, is "supplied incidental to the sale of the product." *General Electric Capital*, 797 F. Supp. at 1442. See also *DuQuoin State Bank v. Norris City State Bank*, 230 Ill. App. 3d 177, 184 (1992); *Nicholas J. Murlas Trust*, slip op. at ___. The end result of the enterprise is some sort of tangible object.

The final category consists of businesses in between these two extremes: businesses that supply tangible goods (or noninformational goods or services) as well as information. *Rankow*, 870 F.2d at 364. Because there may be a fine line between the role of the product and the role of the information supplied, it is particularly critical to scrutinize the precise information and transaction involved in each case. *Rankow*, 870 F.2d at 364. "The critical question for businesses in this category is whether the information is an important part of the product offered. These businesses will be deemed to be in the business of supplying information if the information furnished along with the non-informational goods or services is central to the business transactions." *General Electrical Capital*, 797 F. Supp. at 1443.

Under the above rationale, if an architect or engineer is engaged solely to provide information based upon an evaluation and the value of the services lies in its analytical work rather than a tangible end product, it could be considered to be in the business of supplying information for the guidance of others. An analogous situation is presented in *Tribune Co*. There, plaintiff hired an environmental consulting firm that performed environment assessments and remediation activities to evaluate whether the property plaintiff was interested in acquiring contained any environmental concerns. The court found that plaintiff could maintain an action against the firm based on negligent misrepresentation. The court stated: "Unlike architectural or engineering plans, G&M's report was not meant to result in any tangible structure, the characteristics of which could be easily embodied in contractual terms." *Tribune Co.*, slip op. at ___. Rather, the purpose of the report was to assess the particular property at issue and "locate or identify any visible environmental concerns," including the presence of asbestos-containing materials on the property. *Tribune Co.*, slip op. at ___. Thus, the ultimate result of the parties' relationship was something intangible.

Undoubtedly, there may be circumstances where an architect or engineer is hired to perform services along the line of those in *Tribune Co*. and a negligent misrepresentation would be actionable in tort for purely economic losses. However, based on our resolution below, we need not precisely define what situations would warrant application of the exception.

### B. Applicability of the *Moorman* Doctrine— Application to Facts of the Case

#### 1. KLLM and Walter

Even if there are situations where the negligent misrepresentation exception to *Moorman* would apply, the question remains whether the exception applies in the instant case. Based on the facts present, we would be required, as urged by Tolan, to bifurcate defendants' work into two distinct roles: one role encompassing the defendants' design and construction activities and another role encompassing consultive services related to the cracks. This is so because there is no question that both KLLM and Walter were involved in the construction project on a continual or at least recurring basis from early on.

■ The facts present in the record do not support bifurcation. First, it is clear that each time an inspection was conducted and information imparted to Tolan, the project was ongoing. In fact, when Tolan sought information on building 10 it was for the purpose, *inter alia*, of modifying, if recommended, the foundations of buildings 11

and 12 to avoid similar problems. Ultimately, the design plans for buildings 11 and 12 were revised based upon the inspection of building 10 and the information provided thereto. Accordingly, the information was ancillary to defendants' role in designing and constructing the buildings. The same is true regarding inspection of building 11. This too was, at least in part, for the purpose of modifying, if necessary, the remaining structures to be built. We do not have a situation, as in *Tribune Co.*, where KLLM and Walter were hired to evaluate the structures, apply their analytical expertise, and produce a report imparting information that would be used by Tolan in its business dealings with others. The information defendants supplied was utilized to modify existing plans during the course of construction and was ancillary to the construction.

Based on the foregoing, we find that KLLM and Walter's work cannot be bifurcated. They were not retained to provide an analytical end product. They were retained to design and construct the townhomes. The information supplied by them during the course of construction was incidental to the tangible object—the townhomes. Therefore, the circuit court properly granted their motions to dismiss.

### 2. Reiss

■ With regard to Reiss, we find there are insufficient facts in the record to ascertain the exact nature of his role in the project and whether he was retained to provide only information. Thus, we are unable to determine whether the trial court properly granted Reiss' motion to dismiss.

According to Reiss, he was involved in the project anytime a structural engineering question arose. He supports this contention with excerpts from the deposition of Neil Schoof, KLLM's project manager. However, that deposition transcript is not included in the record; only the quotations used by Reiss in his motion to dismiss and appellate court brief are available. Further, the supportive facts are not alleged in an affidavit. In ruling on a motion to dismiss pursuant to section 2—619, the trial court may consider pleadings, affidavits in support of the motion to dismiss, answers to interrogatories, depositions, and other proofs presented by the parties. *Torcasso v. Standard Outdoor Sales, Inc.*, 232 Ill. App. 3d 500, 501 (1992). Generally, one would presume that the party offering facts from a deposition should file that deposition transcript with the court (see *Wolf v. Bueser*, 279 Ill. App. 3d 217, 221 (1996) (parties can file affidavits and depositions to establish facts to support motion to dismiss); *Pryweller v. Cohen*, 282 Ill. App. 3d 899, 907 (1996) (parties may file affidavits, counteraffidavits, and deposition transcripts in support of motion to dismiss)),

or, at the least, attach copies of the relevant pages as an exhibit (see *Frydman v. Horn Eye Center, Ltd.*, 286 Ill. App. 3d 853, 858 (1997)), and not simply quote from it.

Nonetheless, according to the deposition excerpts, Reiss was contacted approximately 5 to 10 times during the construction of Meadow Mews for recommendations. In particular, he was asked to give his recommendations regarding the design of the foundations based on the soil conditions. Additionally, he apparently created a caisson layout because of the locations of buildings 10 through 12. Finally, there was testimony that he was called out to investigate the cracks. Moreover, Schoof referred to Reiss as a consultant and he was an outside contractor. Reiss was the structural engineer used by KLLM on its projects.

Based on the above, there is insufficient evidence for us to conclude whether Reiss was hired solely as a consultant on the project or whether, like KLLM and Walter, he was intimately involved with construction of the project and his ideas and information were incorporated into the structures. Accordingly, we remand to the circuit court to receive additional evidence on Reiss' role and for further proceedings consistent with this opinion.

## CONCLUSION

We conclude that the *Moorman* doctrine bars plaintiff's claims against defendants KLLM and Walter. We further conclude that the negligent misrepresentation exception to the *Moorman* doctrine does not apply to these defendants. Accordingly, the trial court properly granted KLLM and Walter's motions to dismiss. With regard to defendant Reiss, we vacate the trial court's dismissal order and remand for proceedings consistent with this opinion.

Affirmed in part, and remanded in part, with instructions.

GORDON, P.J., and McNULTY, J., concur.